[No. 29663. *En Banc.* February 14, 1947.]

THE STATE OF WASHINGTON, *Respondent*, v. FRANK W. BIXBY, *Appellant.*[1]

[1]Reported in 177 P. (2d) 689.

148

*Joseph T. Pemberton, J. W. Kindall, John A. Kellogg, C. E. Abrams,* and *R. W. Greene,* for appellant.

*Frank W. Radley, Frank M. Allyn, Boone Hardin,* and *Tom A. Durham,* for respondent.

MALLERY, C. J.—The defendant was convicted of the crime of subornation of perjury. His motion for a dismissal for insufficiency of the evidence at the close of the state's case was denied. Motions for a directed verdict, in arrest of judgment, for a new trial, and for a suspended judgment were likewise denied, whereupon the defendant appeals.

Subornation of perjury is defined in Rem. Rev. Stat., § 2360 [P.P.C. § 118-19], as follows:

"Every person who shall willfully procure another to commit perjury, in either degree, or to offer any false evidence, shall be guilty of subornation of perjury and shall be punished in the same manner as if he had himself committed the perjury so procured or offered the false evidence so offered."

The requisites for an indictment for perjury or subornation of perjury are set forth in Rem. Rev. Stat., § 2072 [P.P.C. § 132-43]:

"In an indictment or information for perjury, or subornation of perjury, it is sufficient to set forth the substance of the controversy or matter in respect to which the crime was committed, and in what court or before whom the oath alleged to be false was taken, and that the court or person before whom it was taken had authority to administer it, with proper allegations of the falsity of the matter on which the perjury is assigned; but the indictment or information need not set forth the pleadings, record or proceedings with which the oath is connected, nor the commission or authority of the court or person before whom the perjury was committed."

Appellant contends that the information is fatally defective, and hence the motion in arrest of judgment should

have been granted. The body of the information is as follows:

"I, F. M. HAMILTON, Prosecuting Attorney in and for the County of Whatcom, State of Washington, come now here in the name and by the authority of the State of Washington, and by this information do accuse FRANK W. BIXBY, with the crime of SUBORNED PERJURY, committed as follows: then and there being in Whatcom County, Washington, that the said defendant, FRANK W. BIXBY, did willfully and unlawfully procure Rose Chapin to commit perjury in the first degree as follows and in this, to-wit: That heretofore, to-wit: on the 21st day of November, 1944, in the Superior Court of the State of Washington in and for Whatcom County, held in Bellingham, in said county and state, on said day, before the Honorable Ralph O. Olson, presiding Judge of said Court, a certain issue in due form and manner joined in said Court, between the State of Washington, aforesaid, and one George Hanowell, upon a certain Information, then pending in said Court against the said George Hanowell, charging him in Six Counts of Carnal Knowledge of a Female Child, to-wit: Jane Doe, whose true name is Rose Chapin, and who was then of the age of fourteen (14) years, and not his wife, came on to be tried and was then and there in due form of law tried by a certain jury of the County, in due manner empanelled and sworn for that purpose and that then and there upon the trial of said issue, Rose Chapin, the Prosecutrix, of Whatcom County, Washington, did then and there appear and was produced as a witness for and on behalf of the State of Washington upon the trial of the said issue and the said Rose Chapin was then and there duly sworn as such witness as aforesaid, by the Honorable Ralph O. Olson, Judge of said Court; that the evidence which she should give to the Court and jury, hearing said issue between the said State of Washington and the said George Hanowell, the defendant, on the issue then pending, should be the truth, the whole truth and nothing but the truth, and the said Rose Chapin being so sworn, as aforesaid, did then and there, upon the trial of said issue, and it being a material inquiry, whether the said witness, Rose Chapin, did have sexual intercourse with and was carnally known by said George Hanowell, at any time within three years prior to the date of filing of the Information in the said cause, and that the said witness, Rose Chapin, had heretofore and under oath, admitted that the

said George Hanowell had had sexual intercourse with her on six different occasions as charged in the Information and the said witness, Rose Chapin, did then and there, on the trial of the issue, as aforesaid, in the said cause, feloniously, willfully, falsely, corruptly, knowingly and contrary to such oath, depose and swear that the said defendant, George Hanowell, did not ever, at any time, have intercourse with her or carnally know her, the said witness, Rose Chapin, and which testimony was false. And so, the said R. M. Hamilton, Prosecuting Attorney of Whatcom County, Washington, as aforesaid, says that the said Rose Chapin, feloniously, willfully, falsely, corruptly, knowingly and contrary to such oath as aforesaid, in a manner and form aforesaid, did then and there commit the crime of perjury and that the defendant, FRANK W. BIXBY, at all times knowing such evidence so given by said Rose Chapin to be false and untrue, did willfully, procure the said Rose Chapin to commit the crime of perjury and the defendant is therefore guilty of the crime of SUBORNED PERJURY as provided by Remington's Revised Statutes of the State of Washington, Section 2360, and in such cases made and provided and against the peace and dignity of the State of Washington."

■■ Appellant contends that, since one found guilty of subornation of perjury is punished in the same manner as if he had himself committed the perjury, he is therefore a principal as defined in Rem. Rev. Stat., § 2260 [P.P.C. § 112-13], as follows:

". . . and every person who directly or indirectly counsels, encourages, hires, commands, induces or otherwise procures another to commit a felony, gross misdemeanor or misdemeanor, is a principal, and shall be proceeded against and punished as such. . . ."

He argues that the words of the above section, "or otherwise procures another to commit a felony," are modified by the prior words "directly or indirectly" and that an allegation of the means or manner by which the procuring was done must be set forth. Since no overt acts by him were directly alleged, the appellant contends the allegation that he procured Rose Chapin to commit the crime of perjury is a mere conclusion, and the omission of such ma-

terial allegations as to the means employed is a fatal defect in the information.

Similar objections were raised in *State v. Porter,* 105 Iowa 677, 75 N. W. 519, a case presenting a parallel set of facts and decided on statutes very like our own. We quote *in extenso* from this well-reasoned opinion and follow the rule therein laid down.

"The indictment in this case sets out the charging part of the indictment in the nuisance case; that Revell was a witness therein, duly sworn; and that 'the said J. N. Porter did then and there willfully, corruptly, and feloniously suborn and procure him, the said Frank Revell, falsely to depose and swear, upon his oath aforesaid, in substance and to the effect following.' Then follows what is charged as the false testimony. It is insisted that the simple statement that Porter did 'suborn and procure' Revell to testify falsely is not enough, but that the means or method employed ought to be set out. The indictment includes the language of the statute, and this is sufficient in all cases where the statute so far individuates the offense that the offender has proper notice, from the statutory terms, of the particular crime charged. Wharton Criminal Pl. & Prac. 220. This is not a case where there is necessity for so stating the particular facts constituting the inducement as to identify the transaction, nor is it one in which the method or means could have been lawful. If the defendant induced Revell to testify falsely, and did so knowingly, it is quite immaterial what means he used,—whether in themselves illegal or not. The crime does not inhere in the method or means, but in the result,—the procurement; and the defendant could be guilty of only one such offense as to a witness in a particular case. . . . One guilty of subornation of perjury has been adjudged an accessory before the fact of perjury. *Com. v. Smith,* 11 Allen, 243. So it has been held that one charged with subornation of perjury may be presented in the same indictment with one accused of perjury, though each offense is made by statute a substantive felony. *Com. v. Devine,* 155 Mass. 224 (29 N. E. Rep. 515); *Reg. v. Goodhall,* Russ. & R, 461; *Reg. v. Goodhall,* 2 Russ. Crimes, 622, note o. Under our statute, distinctions between accessories before the fact and principals are abrogated, and all must be indicted as principals. Code 1873, section 4314. And, where a crime may be committed by only one person, another may be joined in the indict-

ment, and convicted, for aiding therein. *State v. Comstock*, 46 Iowa, 266. In such cases the particular facts or method of aiding or abetting are not set out, the crime only being charged. Why should the particular facts constituting the procurement of one to commit perjury be particularly stated in an indictment for subornation thereof? It is made a distinct offense, under the statute; but this would not necessarily change the rule of pleading, more than to require the use of the language defining it in connection with the necessary allegation charging the commission of perjury. And this seems to have been the rule generally adopted. See Wharton Criminal Law, section 1329; Wharton Precedents, Indictments, section 597; 2 McClain, Criminal Law, section 893 *et seq.*; *Com. v. Devine, supra*. The court rightly held the indictment not defective in the respect claimed."

In *State v. Stuhr*, 1 Wn. (2d) 521, 96 P. (2d) 479, the question was before this court whether the words "indecent liberties," as used in Rem. Rev. Stat. (Sup.), § 2442 [P.P.C. § 118-195], are so indefinite in meaning that an information must go beyond the statute and plead the specific act or acts relied on to constitute the crime. In holding that it was sufficient to charge the crime in the language of the statute, we said:

"The general rule is set out in *State v. Randall*, 107 Wash. 695, 182 Pac. 575, to the effect that it is sufficient, in charging a crime, to follow the language of the statute. To that rule, we have recognized exceptions in the case of general statutes, such as those covering conspiracy, *State v. Scollard*, 126 Wash. 335, 218 Pac. 224, 32 A. L. R. 1082; forgery, *State v. Kuluris*, 132 Wash. 149, 231 Pac. 782; and extortion, *State v. Pettett*, 141 Wash. 668, 252 Pac. 104."

The information was substantially in the language of Rem. Rev. Stat., § 2360, and contained the requisites enumerated in Rem. Rev. Stat., § 2070 [P.P.C. § 132-39]. We adhere to the rule:

"Under these simplifying provisions [statutory forms of indictments] it is the general rule that an information or indictment is sufficient if the act or omission charged as the offense is clearly and distinctly set forth in ordinary and concise language, without repetition or great specification of particulars, and in such manner as to enable a per-

son of common understanding to know what is intended, and to enable the court to pronounce judgment on a conviction, according to the right of the case, even though matters of an evidentiary nature are omitted therefrom, especially where they are of such nature as may be supplied by bill of particulars on application therefor seasonably made." 27 Am. Jur. 620, Indictments and Informations, § 53.

■ We quote appellant's next contention:

"The concluding portion of this charging part is that Rose Chapin testified that George Hanowell 'did not ever, at any time, have intercourse with her or carnally know her, the said witness, Rose Chapin, *and which testimony was false.*' This is simply the legal conclusion of the pleader in the words 'which testimony was false': There is not any allegation of any facts whatsoever to show the falsity of the testimony or any allegation that there had been any sexual intercourse between the parties and this information is far short of the requirements of the code which demand that the matter be pleaded *'with proper allegations of the falsity of the matter on which the perjury is assigned.'*"

The information charged that the witness willfully and falsely testified that she had never had intercourse with George Hanowell and that such testimony was false. This carried the necessary conclusion that she had had intercourse with Hanowell. To have alleged by way of antithesis that in fact she had had intercourse with Hanowell, would in no way have more clearly advised the appellant of the charge against him.

As stated in *Carter v. State*, 181 Ark. 665, 27 S. W. (2d) 781:

"The rule is that it is not necessary to negative the truth of the alleged false testimony in an indictment if the alleged false testimony itself necessarily implies that its converse is true, and what the converse is. In that event the implication is equivalent to such an allegation."

See, also, *State v. King*, 165 Ore. 26, 103 P. (2d) 751; *United States v. Otto*, 54 Fed. (2d) 277.

In his next contention, appellant raises two objections to the information: (1) that "the inducement is contained in the first 8 lines and does not *have any allegation as to*

*time to show that it is within the period of limitations* and this allegation is not contained elsewhere in the information"; and (2) that nowhere in this information is to be found the date of the filing of the information against Hanowell, upon whose trial the perjury was alleged to have occurred.

■ Neither objection is meritorious. With regard to the first: Rem. Rev. Stat., § 2065 [P.P.C. § 132-29], provides that:

"The indictment or information is sufficient *if it can be understood therefrom,—* . . .

"(5) That the crime was committed at some time previous to the finding of the indictment, or filing of the information, and within the time limited by law for the commencement of an action therefor; . . . " (Italics ours.)

The information charges that Rose Chapin committed perjury "on the 21st day of November 1944."

"In perjury and subornation of perjury the act of the two offenders is concurrent, parallel, and closely related in point of time and conduct. The two crimes both culminate in the delivery of false testimony. Still the offenses are dual, each having in it elements not common to the other." *Stone v. State,* 118 Ga. 705, 45 S. E. 630, 98 Am. St. 145; 41 Am. Jur. 41, Perjury, § 74.

Thus the time of the alleged subornation of perjury is fixed by the information in the case at bar as November 21, 1944. This meets the requirements of the statute.

■ As to the time of the filing of the Hanowell information, that is important only as it has a bearing on the materiality of the testimony alleged to be false. We may concede that, had the statute of limitations run against the Hanowell offense prior to the filing, the testimony would not have been material. However, the materiality need not be alleged by setting forth specific dates to negative the running of the statute of limitations.

In *State v. Ingels,* 4 Wn. (2d) 676, 104 P. (2d) 944, we said, p. 691:

"It is, however, a well established rule of law that the materiality of a statement alleged to be perjured may be

charged in an indictment either by an allegation or averment of materiality or by pleading facts which show materiality. *People v. De Carlo,* 124 Cal. 462, 57 Pac. 383; *People v. Ah Bean,* 77 Cal. 12, 18 Pac. 815; *State v. Horine,* 70 Kan. 256, 78 Pac. 411; *Rich v. United States,* 1 Okla. 354, 33 Pac. 804; *Thompson v. People,* 26 Colo. 496, 59 Pac. 51; *State v. Kellis,* 193 Ind. 619, 141 N. E. 337.

"In 48 C. J. 878, § 128, is found the following:

" 'Materiality being an element of the offense, an indictment or information for perjury, in the absence of a statute to the contrary, must allege or show that the false statement on which the charge is based was material to the issue or matter involved, or it will be fatally defective.

. . .

" 'It has frequently been held or stated that the showing as to materiality may be made either by a general averment to that effect or by the allegation of facts from which its materiality will appear; and hence, as hereinafter pointed out, where either method is used, the indictment or information is not bad for failure to use the other also.' "

■ The allegation of materiality in the information is sufficient. The materiality of the evidence in question is not and could not be disputed. Rose Chapin admitted on many different occasions and to many different people that Hanowell had had sexual intercourse with her. She admitted it to the appellant when he visited her in the county jail late in September. She admitted it to the juvenile judge when she came before him. She admitted it to both of her parents. Yet, when she took the witness stand under oath on the Hanowell trial, she flatly denied any intimacies with him; whereupon the state moved for a dismissal because it had not made a *prima facie* case to submit to the jury.

Appellant has assigned error upon the court's refusal to grant his various motions relating to the sufficiency of the evidence.

■ It was incumbent upon the state in this case to prove that, on the Hanowell trial, Rose Chapin, while under an oath administered by one having proper authority, in a court of proper jurisdiction, knowingly and willfully testified falsely to issues material to that cause. It is elemen-

tary that there can be no offense of subornation of perjury unless the perjury was actually committed. *Hammer v. United States*, 271 U. S. 620, 70 L. Ed. 1118, 46 S. Ct. 603; *United States v. Evans*, 19 Fed. 912.

 Appellant contends that no perjury was committed, since, upon the trial of Hanowell, Rose Chapin recanted before the case was submitted to the jury.

Upon visiting the Chapin home in September of 1944, two of the sheriff's deputies were told by Rose Chapin that she had permitted Hanowell to have sexual intercourse with her. Shortly thereafter, Rose Chapin was arrested and, on the day of her arrest, made a sworn statement in the presence of Mr. Hamilton, the prosecuting attorney, the deputy sheriffs, and the court reporter, recounting in detail seven acts of intercourse with Hanowell. Hanowell was arrested and subsequently retained the appellant to defend him.

On the day before that trial, Rose Chapin, accompanied by her parents, visited the appellant at his office and there subscribed and affirmed an affidavit in which she stated, *inter alia*, that:

"At no time when we were out, were George Hanowell and I alone together and no act of sexual intercourse ever occurred between us."

Rose Chapin's testimony on the morning of the Hanowell trial followed closely the story set forth in the affidavit made in the appellant's office. After the noon recess, the state once again put her on the stand. The questioning took the following course:

(By Mr. Hamilton) "Do you want to change your mind any as to this statement that you made here in the evidence this morning? Which is correct? Did you tell the truth this morning, Rosie, or did you tell the truth when you made this statement? A. *I told it when I made the statement.* Q. When you made this statement, then, you were telling the truth at that time. A. Yes . . . Q. Well, Rosie, let me ask you this: This morning, when I was asking you about these six different acts of intercourse from your statement that you had made to me and which Mr. Rand took down as court reporter, was that correct?

Was that true? MR. BIXBY: I object to the question. THE COURT: Do you understand the question? (Witness doesn't answer) THE COURT: Your answer to that question may be yes or no. If you will, please, answer the question. A. *It wasn't true."* (Italics ours.)

The ambiguity in the above-quoted testimony is at once apparent. Who can fairly say, from an examination thereof, as to which statement the witness was referring? When the witness stated "It wasn't true," was she referring to the statement made that morning in court, which corresponded to her affidavit of the preceding day, or was she alluding to the statement made in Hamilton's office on the day of her arrest?

In the trial of the case at bar, Judge Olson on cross-examination was asked:

"Q. But when she was on the witness stand in the afternoon session of the trial she stated that she had sustained sexual relationship with Hanowell, did she? A. I don't think she did, Mr. Greene. Her answer was indistinct."

Rose Chapin was apprised by the court of her constitutional immunity against self-incrimination in the instant case, yet she gave the following testimony:

"Q. (by Mr. Greene on cross-examination) Now, Rose, when you went back on the witness stand in the afternoon, do you know what you said, or what happened? A. Partly. Q. But you were pretty badly rattled and everything, weren't you. A. Yes. Q. *But you still told the same story that you had when you were on the stand in the morning?* A. *Yes."* (Italics ours.)

Upon this state of the record, we cannot say that Rose Chapin corrected her testimony, and therefore the doctrine of recanting cannot be invoked.

█ There is no question in this case concerning the validity of the oath or the jurisdiction of the court. Nor is it argued, except for the argument that Rose Chapin recanted, that she did not commit perjury or that the perjured testimony was not material. The question is: *Was the perjury suborned by the appellant?* In order to meet this question, the state was obliged to prove that Rose

Chapin's false testimony was willfully procured by the appellant, who knew that the testimony was false and who further knew that Rose Chapin would so testify. *United States v. Evans, supra.*

Throughout the summer of 1944, Hanowell employed Rose Chapin and her sister and cousins, all minor females, to pick beans and berries at his farm near Everson, transporting them to and from work in his automobile. Their day's work done, these people often would drink beer or wine supplied by Hanowell, either at a little house upon the farm or joyriding in Hanowell's car. It was upon such occasions that Hanowell and Rose Chapin would leave the group long enough to have sexual intercourse.

The first act of intercourse occurred in Hanowell's car fifty feet in front of the Chapin's residence and, except for the dark of night, in view of both the house and U. S. Highway No. 99.

On September 20, 1944, Georgia Kleer, one of the other berrypickers, though no relation to the Chapins, accompanied Mr. and Mrs. Hanowell to appellant's office and there signed an affidavit to the effect that Hanowell had never in her (Georgia's) presence taken liberties with Rose Chapin nor ever been alone with her. At a later date, Virginia Siener, Rose's oldest sister, age nineteen, went to the appellant's home with Hanowell, and there told the appellant that Rose and Hanowell had been alone at times but "probably not long enough to do anything." In accordance with this evidence, the gist of Hanowell's defense was to be lack of opportunity. These are also facts upon which appellant relies to establish his honest belief that Rose Chapin and Hanowell had never had sexual intercourse, and as a consequence, that when Rose Chapin made the aforementioned affidavit in his office the day before the trial, denying any relationship with Hanowell, and the next day testified according to that affidavit, he believed that she was telling the truth.

The evidence is, however, ample to support the jury's finding, beyond a reasonable doubt, that appellant did not believe Rose Chapin's testimony at the Hanowell

trial. About ten days after Hanowell was arrested, appellant called upon prosecuting attorney Hamilton to ask permission to visit Rose Chapin, who was then in the county jail. Hamilton granted permission, telling appellant that Hanowell had admitted his guilt. Subsequently, while appellant was interviewing Rose Chapin in the kitchen of the jail, Hamilton appeared and interrupted to ask appellant to come to his office when he was through. In compliance with this request, appellant walked into the prosecutor's office and said, "Well, the little girl won't shake a bit in her story." Hamilton again told appellant of Hanowell's admissions (that he had admitted having intercourse with Rose six times in the United States and once in Canada) and informed appellant that unless Hanowell would plead guilty, the information would be amended to charge Hanowell on six counts. To this the appellant replied, "He said he wasn't guilty."

Subsequent to the drawing up of the Kleer affidavit, appellant, with Hanowell and his wife, interviewed at their school Bernice Chapin, Rose's sister, and Margaret Radder, Rose's cousin, both of whom resided with the Chapins, and were there told by the girls that Rose and Hanowell had been alone together on various named occasions. Shortly after this interview, these two girls were visited at school by one of the deputy sheriffs and an F. B. I. agent, who obtained from them detailed sworn statements concerning their knowledge of the affairs of Rose Chapin and Hanowell. On the day following, Bernice and Margaret went with Mr. and Mrs. Chapin to the defendant's office, where they admitted having signed papers for the officers. In answer to questioning by the appellant, the girls stated that the sworn statements made the previous day were true. Notwithstanding, on the representation that Rose Chapin, who was in a foster home by order of the juvenile court, would be allowed to go home if Hanowell were acquitted, appellant induced the girls to sign affidavits contradicting the statements that they had made the day before and further averring that, to their knowledge, Hanowell and Rose were never alone together.

Mr. and Mrs. Chapin testified that they had told appellant that, while they thought that Rose's story to the effect that she had had intercourse seven times might have been exaggerated, they nevertheless believed that Hanowell had had intercourse with her.

Rose Chapin, herself, had told the appellant, both during the interview in the county jail and on the day before the trial when she went to his office, that she and Hanowell had had intercourse.

This evidence is sufficient to prove the willfullness of the appellant's crime.

" 'Willfully,' is equivalent to 'knowingly.' 'Willfully,' as used when saying that an act was willfully done, implies that the act was done by design; done for a set purpose; and it would follow that it was knowingly done. The term 'willfully' implies that the act is done knowingly. The word 'willfully' implies, on the part of the wrongdoer, knowledge, and a purpose to do the wrongful act. 'Willfully,' as used in connection with an act forbidden by law, means that the act must be done knowingly or intentionally, and that the act was committed with knowledge, and that the will consented to, designed, and directed the act. In common parlance, 'willfully' is used in the sense of 'knowingly,' as distinguished from 'accidental' or 'involuntarily.' *Hutchman v. State,* Okl. Cr. App., 66 P. 2d 99, 102." 45 Words and Phrases 218.

We have already mentioned briefly the fact that Rose Chapin executed an affidavit in appellant's office. We now set out the surrounding circumstances. On November 20, 1944, the day before the Hanowell trial, Mr. and Mrs. Chapin and Rose Chapin visited the appellant at his office. At this time, Rose Chapin gave the appellant her carbon copy of the sworn statement which she had made in the prosecutor's office on the day of her arrest. That statement described in detail the seven occasions when sexual intercourse was had.

Appellant, by his own admission, failed to read that statement carefully. Instead, he related to the Chapins that, during his term as prosecuting attorney, he had tried a similar case where the prosecutrix, when put on the wit-

ness stand, denied for the first time that she had had intercourse with the defendant, so that he, as prosecutor, was compelled to dismiss the action. He then drew up the following affidavit, already alluded to, which he caused Rose to sign:

"Comes now Rose Chapin, and after first being duly sworn, on oath, deposes and says:

"That I resided with my parents, Mr. and Mrs. Herbert Chapin, on a ranch near Blaine, Whatcom County, Washington, until sometime in September, 1944, when I was brought to the county jail and kept for two weeks as a delinquent and then went to the home of some people living at Agate Bay.

"I formerly attended the Blaine High School and after coming to Bellingham and being sent to Agate Bay, I began attending the Bellingham High School.

"That before bringing me to Bellingham, two deputy sheriffs came to my home near Blaine and took me out to their car and asked me questions about George Hanowell and told me George Hanowell was talking about me and telling lies about me and I got mad at George Hanowell for telling lies about me and told the officers that George had had sexual intercourse with me and they kept asking me questions and I kept telling them imaginary stories.

"That I am now in the office of Frank W. Bixby, attorney, for George Hanowell, and came to the office with my father and mother voluntarily to make a true statement and I am sorry I told the officers what I did tell and wouldn't have told them the stories I did, had they not told me that George Hanowell was telling stories about me and lying about me.

"That I picked beans and berries for George Hanowell and he carried all of us girls back and forth between the bean patch and home.

"and he was very nice, taking us to Blaine, Vancouver, Birch Bay when we asked him to take us. If he had not been nice to us and taken us where we wanted him to, we would have quit picking beans and berries for him.

"At no time when we were out, were George Hanowell and I alone together and no act of sexual intercourse ever occurred between us.

"I am making this statement freely and voluntarily for the purpose of telling the truth and have been wanting to

tell the truth in the matter for a long time, but did not dare tell the officers that I had not told them the truth and this is the first time I have had the opportunity of telling the real truth in the matter."

Rose Chapin's testimony in the Hanowell trial closely followed the statements contained in the above affidavit:

"Q. (by Mr. Hamilton) Well, as charged here, did Mr. Hanowell at any time have intercourse with you? A. No, he did not. It was all a lie, I put it up because I was mad at him, the way he had been telling things about me, and that's why I told this about him, and when the officers were questioning me I gave up this imagined story. Q. Who made up this imagined story? A. I did. Q. You mean now to tell me that he never had intercourse with you? A. That's right."

Appellant seeks to explain the taking of the affidavits as being merely good practice, customarily done by many attorneys, for the purpose of impeaching the witness, if necessary. He further contends that, in taking the affidavit from Rose Chapin, he told her that if she were to tell the truth in the Hanowell trial and the judge believed her, that the judge might allow her to go home to her parents.

The testimony of Rose Chapin directly contradicts appellant's contention as to his good faith and clearly establishes that appellant *willfully procured* Rose Chapin to perjure herself when she took the witness stand in the Hanowell trial.

" (Rose Chapin on direct examination) Q. And after you had been placed in the foster home, and before the trial on the 21st day of November, 1944, did you see Mr. Bixby any place? A. Yes; up in his office. Q. And his office is in the City of Bellingham? A. Yes. Q. Who was with you when you saw Mr. Bixby? A. My mother and father. Q. Did Mr. Bixby talk to you? A. He did. Q. Did he ask you whether or not you had a statement in your possession? A. Yes. Q. What did you say to him? A. I told him yes. Q. What was that statement? A. It was the statement which I made to Mr. Hamilton in the office. Q. Was that more than one page? Yes. Q. Was it made in the presence of this man that sits right here? A. Yes. Q. The court reporter? A. Yes. Q. Did you give that

statement to Mr. Bixby? A. Yes. Q. Did he read it over? A. Yes. Q. Then, what else did Mr. Bixby say to you then? A. *He asked me if I wanted to make out an affidavit denying the truth.* Q. What did you tell him? A. I told him I guessed so. . . . Q. Did you tell Mr. Bixby that the statement that you made to the prosecuting attorney was not true? A. No. Q. Why did you sign the other statement for Mr. Bixby? A. *Because he told me that if I signed this the trial would be dropped and then I would get to go home."* (Italics ours.)

Again on cross-examination:

"Q. Now, when you went up to Mr. Bixby's office, you say you had this record, that copy of what had happened before Mr. Hamilton? A. Yes. Q. And you had signed it? Mr. Hamilton had asked you to sign it, and you had signed it in his office? A. Yes. Q. And Mr. Bixby asked you some questions and then he asked you if you would be willing to sign a statement about what you had told, didn't he? A. No. Q. What did he say? A. *He asked me—he wanted me to make out an affidavit denying the truth, denying that I did have sexual intercourse with Hanowell.* Q. Was an affidavit made out? A. Yes. Q. Was that all that was in the affidavit, Rosie? A. No. Q. Now, after you made the affidavit, after you signed the affidavit there, you said something about what was said by Mr. Bixby. Now, Rosie, didn't he tell you that, when you went to court, if the Judge thought that you were telling the truth that he might let you go home, that is what he said, isn't it? A. Not that I remember. Q. What was it he said? A. *He said that, if I told it the way it was there, like that made in his office, that the case would be dropped.* A. *What case?* A. *The trial."* (Italics ours.)

The word "procure" is defined in 3 Bouvier's Law Dictionary (3d Rev.) 2733:

"To contrive, effect, or bring about; to cause. *Long v. State,* 23 Neb. 45, 36 N. W. 310."

Mr. Bixby's conversation in telling of the case he prosecuted years ago and was compelled to dismiss, coupled with his statements to the Chapins and Rose to the effect that the trial would be dropped if Rose Chapin would testify according to the affidavit made in his office, were sufficient to warrant the jury in finding that he had, beyond a rea-

sonable doubt, "procured" Rose Chapin to commit perjury. These statements were certainly calculated to cause Rose Chapin to swear falsely the next day, just as she did.

 There is little dispute as to the amount of evidence necessary to establish the "suborning," in a subornation of perjury charge. The rule is well stated in *State v. Ruskin,* 117 Ohio 426, 159 N. E. 568; 56 A. L. R. 403. It is there said, quoting from *State v. Renswick,* 85 Minn. 19, 88 N. W. 22:

" 'If, in the prosecution of a party for subornation of perjury, it is sought to establish the fact that perjury was committed by the person suborned, his testimony must be corroborated as to such fact. But the alleged fact that he was induced to commit the crime by the accused may be established by his uncorroborated testimony if it satisfies the jury beyond a reasonable doubt.' "

The reason for the rule was early stated in *Commonwealth v. Douglass,* 46 Mass. (5 Met.) 241, in which the court said:

"The first exception relates to the evidence necessary to prove the crime charged in the indictment. The defendant's counsel contends that the whole charge must be proved, either by two witnesses, or by one witness and by other independent evidence corroborative of his testimony. It is admitted that such evidence is necessary to substantiate that part of the indictment which alleges that the crime of perjury was committed by the person therein named; and in this respect no objection is made to the instructions of the court to the jury. And as to that part of the indictment, which charges the defendant with subornation of perjury, or procuring the commission of the said crime, we think it very clear that the same rule of evidence does not apply. The reason of the rule in cases of perjury is, that the same effect is to be given to the testimony of the party accused, as to that of the accusing witness, so that if there be no other proof, the scale of evidence is poised; there being witness against witness, oath against oath. No such reason exists as to the proof of that part of the indictment which charges the defendant with the procuring of the commission of the perjury; and this part of the charge, as we think, may undoubtedly be proved by the testimony of one witness. This exception therefore is not founded on any good reason, nor do we find it sustained by any authority."

See, also, *Bell v. State,* 5 Ga. App. 701, 63 S. E. 860; *Stone v. State,* 118 Ga. 705, 45 S. E. 630, 98 Am. St. 145; *State v. Wilhelm,* 114 Kan. 349, 219 Pac. 510; and *State v. Gleason,* 86 Utah 26, 40 P. (2d) 222.

The trial court's denial of appellant's motion challenging the sufficiency of the evidence was proper, and the motions for a directed verdict, in arrest of judgment, and for a new trial were properly refused.

 Appellant further assigns as error the admission by the trial court of secondary evidence of the personal recollection of Judge Olson, when the court already had before it the reporter's transcript of Rose Chapin's testimony in the former trial, which had been admitted in evidence by stipulation. The testimony objected to is as follows:

Judge Olson (on direct examination) "Q. I will ask you whether or not in substance did she make any statement whether or not she had had relationships with Mr. Hanowell at any time? . . . A. As I recall her testimony she said she had not."

According to 4 Wigmore on Evidence 651, § 1330:

"(1) There has never been, in the practice of the common law, any person required or even authorized by law to take in writing the testimony of the witnesses. Hence, the rule from the beginning has always been that no preferred witness is recognized, in proving testimony given at a former trial; so that anyone who heard it may testify from recollection, with or without the aid . . . of written notes:

"(2) . . . McIver, J., in *Brice v. Miller,* 35 S. C. 537, 549, 15 S. E. 272: 'While it may be true that what a witness writes down himself, or what is contained in some paper written by another and signed by himself, may be the best evidence of what the witness has said on a former occasion, it does not follow that where a third person, be he stenographer or not, takes down in writing what a witness said, this writing is the best evidence, in such a sense as to exclude any other. Stenographers are no more infallible than any other human beings, and while as a rule they may be accurate, intelligent, and honest, they are not always so; and therefore it will not do to lay down as a rule that the stenographer's notes when translated by him are the best evidence of what a witness has said, in such a sense

as to exclude the testimony of an intelligent bystander who has heard and paid particular attention to the testimony of the witness.'

"That the *stenographer* is an *official* one does not make the case any stronger so far as concerns the probable accuracy of the report; nor does it bring the case within the principle of the preceding sections, for the stenographer does not act as an independent officer of the Court, but only under the orders of the judge or the State's counsel; in most jurisdictions the official duty of the stenographer has not even sufficed to admit the reports as an exception to the Hearsay rule. . . . and there seems little judicial disposition to require such reports to be produced as preferred testimony."

Judge Olson was the presiding judge in the Hanowell trial. As such, he certainly qualifies as an "intelligent bystander who has heard and paid particular attention to the testimony of the witness." See, also, *Garrett v. Weinberg*, 54 S. C. 127, 31 S. E. 341, 34 S. E. 70. This assignment of error not sustained.

Herbert and Florence Chapin, Rose's parents, were co-indictees with the appellant and, upon motion of the prosecutor, were dismissed by the court before the jury was empanelled, so that they might testify for the state and so that "the ends of Justice will best be served."

Error is assigned upon the court's refusal to charge the jury with appellant's requested instruction No. 7, quoted below, or with any similar cautionary instruction.

"You are instructed that Herbert F. Chapin and Florence Chapin were dismissed as defendants herein so that they might be available as witnesses to testify in behalf of the State and in this connection, you are instructed that as defendants they were interested parties and that this interest continues when they have been discharged as defendants and that as witnesses they are regarded as co-defendants or accomplices; You are further instructed that the law makes them competent witnesses in behalf of the State but that you have a right to consider what inducements, if any, may have been given for their discharge and release as defendants and their testimony as witnesses in behalf of the State. In this connection you are instructed that the testimony of an accomplice or former co-defendant,

who has been discharged as a defendant so that he might act as a witness for the state, must be received with great caution and such testimony must carry conviction beyond a reasonable doubt."

It is not error to refuse a requested instruction which does not correctly state the law. *Brewer v. Berner,* 15 Wn. (2d) 644, 131 P. (2d) 940; *Schmidt v. Pelz,* 198 Wash. 80, 87 P. (2d) 278; *Sanderson v. Hartford Eastern R. Co.,* 159 Wash. 472, 294 Pac. 241.

In the case of *People v. Kosta,* 14 Cal. App. 696, 112 Pac. 907, the defendant and four others were charged as co-defendants with the crime of arson. Two of these parties were dismissed by the court upon motion of the prosecutor on the ground that the evidence against them was insufficient. They then testified for the prosecution. The appellate court held that the filing of an information against several defendants and its subsequent dismissal against one for want of evidence does not establish, for the purpose of the trial of the remaining defendants, that the defendant dismissed was an accomplice. In accord with this principle are *Harless v. United States,* 1 Ind. Terr. 445, 45 S. W. 133, 92 Fed. 353, 34 C. C. A. 400; *Downard v. Commonwealth,* 13 Ky. L. 472, 17 S. W. 439; and *People v. Frahm,* 107 Cal. App. 253, 290 Pac. 678.

That the Chapins were in fact accomplices was never established. They were dismissed before the jury was empanelled, and there is nothing in the record to show that they were granted any immunity as a reward for testifying for the state, nor did the prosecution at any time admit their accomplicity.

"Whether a person is an accomplice depends upon the facts in each particular case. That one is an accomplice must be shown by proof, like any other fact. The burden is on the defendant to show that the witness for the state is an accomplice. This is usually determined by the court as a question of law. But if the evidence is conflicting as to the participation of the witness in the commission of the crime, the matter should be left to the jury under proper instructions as to intent and participation." Underhill's Criminal Evidence (4th ed.) 225, § 150.

There was not enough conflict on this point to warrant the court in submitting to the jury the question of the accomplicity of the Chapins. An instruction *assuming* that these people were accomplices would not be proper in this case.

■ Even though it be conceded, and it is not, that the witnesses were accomplices, this case would be clearly analogous to that of *State v. Troiani,* 129 Wash. 228, 224 Pac. 388, in which this court refused a requested instruction similar to that under consideration here. We there said *per curiam*:

"Conceding that the witness referred to was an accomplice, his testimony was corroborated by the testimony of at least half a dozen other witnesses, and while the instruction was a proper one to have given, and is a necessary one probably where the accomplice's testimony is uncorroborated (*State v. Pearson,* 37 Wash. 405, 79 Pac. 985; *State v. Jones,* 53 Wash. 142, 101 Pac. 708; *State v. Stapp,* 65 Wash. 438, 118 Pac. 337), yet the failure to give the instruction was not prejudicial. *State v. Simpson,* 119 Wash. 653, 206 Pac. 561. The rule is stated generally in 1 R. C. L. 172, as follows:
" 'Whatever the rule of practice on this subject, the failure or refusal of the court to give cautionary instructions will not, it seems, constitute reversible error where there is evidence corroborative of the testimony of an accomplice.' "

The court clearly instructed the jury as to the weight and credibility to be allowed the testimony of the several witnesses. This we deem sufficient.

■ Appellant further assigns error upon the court's refusal of requested instruction No. 8, which was designed to caution the jury to use "greater care" in weighing the testimony of certain law enforcement officers because of

" . . . their interest in the case and because of the natural and unavoidable tendency and bias of mind of such persons to construe everything as evidence against the accused, and disregard everything which does not tend to support their preconceived opinions of the matter on which they are engaged."

An instruction, identical word for word with that part quoted above, was, in the case of *Everett v. Simmons*, 86 Wash. 276, 150 Pac. 414, held by this court to have been properly refused upon the ground that it was argumentative. The assignment is without merit.

A considerable amount of evidence was adduced concerning certain affidavits made in the appellant's office by Bernice Chapin, Margaret Radder, and Georgia Kleer, and there was testimony to the effect that, at the time these affidavits were made, the girls were told by the appellant that they could "stretch the truth a little."

■■■ The court's instruction No. 6 defined the crime of perjury in the words of the statute, Rem. Rev. Stat., § 2351 [P.P.C. § 118-1], as follows:

"You are instructed that every person who, in any action, proceeding, hearing, inquiry, or investigation, in which an oath may lawfully be administered, shall swear that he will testify, declare, depose or certify truly, or that any testimony, declaration, deposition, certificate, affidavit or other writing by him subscribed is true, and who, in such action, proceeding, hearing, inquiry or investigation shall state or subscribe as true any material matter which he knows to be false, shall be guilty of perjury in the first degree."

Appellant assigns error upon this instruction, having excepted to it on the grounds that the words of the statute are too broad, in that this case involves nothing but the sworn testimony of Rose Chapin, and that the instruction would mislead the jury into considering the above-mentioned affidavits as constituting one of the elements of the crime. The assignment is without merit.

In its subsequent instructions, the court so well defined the issues that we are unable to see how the jury could have been misled by instruction No. 6.

"Instructions given by the court to a jury must be construed as a whole, and if, when so construed, they properly present the issues and state the law, they are sufficient." *State Bank of Wilbur v. Phillips*, 11 Wn. (2d) 483, 119 P. (2d) 664.

170

■ Furthermore, the court's instruction No. 6 was in the language of the statute.

"As a general rule where the law governing a case is expressed in a statute, the court in its charge not only may, but should, use the language of the statute, and may, indeed, be guilty of error if it employs language which constitutes a departure in an essential respect from the statute." 53 Am. Jur. 433, Trial, § 542.

As we have already mentioned, in the trial of the instant case, Mr. Hamilton, the prosecutor in the Hanowell trial, testified, over objection, that when appellant came to his office before and after visiting Rose Chapin in jail, he told appellant that Hanowell had admitted his guilt and that he had then offered to charge Hanowell with but one count if Hanowell would plead guilty.

Appellant assigns error upon the admission of this evidence on the grounds: (1) that it was a portion of negotiations which did not meet with success, and therefore privileged, and (2) that the testimony in question amounted to an alleged admission of a third party, not made in the presence of the defendant in this action, and was therefore hearsay.

■ Offers to compromise criminal actions are not privileged. 4 Wigmore on Evidence (3d ed.) 31, § 1061; *State v. Bruemmer*, 133 Wash. 579, 234 Pac. 448; *State v. Humphreys*, 118 Wash. 472, 203 Pac. 965.

■■ As to the second ground, the testimony was admitted for the sole purpose of showing appellant's knowledge of the facts alleged in the Hanowell information. Appellant's particular objection to the admission of this testimony is that, even though Hanowell at all times denied his guilt to appellant, and pleaded not guilty, appellant was charged with knowledge of Hanowell's guilt simply because he was told by Hamilton that Hanowell had admitted his guilt to him.

In order to obtain a conviction in the instant case, it was incumbent upon the state to show that appellant knew the testimony he procured Rose Chapin to give was false. Evidence that appellant was advised that Hanowell had

admitted to the prosecutor and to the deputy sheriffs that he had had sexual intercourse with Rose Chapin, was admissible to show the extent of appellant's information as to Hanowell's guilt. This has a bearing upon his contention that he in good faith believed Hanowell innocent and thought Rose Chapin's testimony was true.

"Wherever an utterance is offered to evidence the *state of mind* which ensued *in another person* in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it, and the utterance is therefore admissible, so far as the Hearsay rule is concerned. . . . [Citing passages where this rule is expounded] On this principle the Hearsay rule interposes no obstacle to the use of letters, notices, oral informations, reputation, or any other form of verbal utterances by one person, as circumstantial evidence that *another person had knowledge* or belief as to . . . the *guilt of an arrested person.*" 6 Wigmore on Evidence (3d ed.) 235-237, § 1789.

In *Moen v. Chestnut,* 9 Wn. (2d) 93, 113 P. (2d) 1030, the respondent in an automobile accident case was permitted by the trial court to testify that her companion had warned her, "This is Summitview we are coming to. It is a very bad intersection and be careful." This evidence was admitted on the theory that the respondent had "testimonial knowledge" as to whether or not the statement was made to her, and that the jury had the right to consider whether or not such statement, if made, "had anything to do with her [respondent's] subsequent actions." In affirming the decision of the court below, we said:

" 'The Hearsay rule forbids merely the use of an extrajudicial utterance as an assertion to evidence the fact asserted. . . . Such a use would be testimonial, *i.e.* we should be asked to believe the fact because Doe asserted it to be true, precisely as we should be asked to believe Doe's similar assertion if made on the stand. What the Hearsay rule forbids . . . is the use of testimonial evidence —*i.e.* assertions—uttered not under cross-examination. If, then, an utterance can be used as circumstantial evidence, *i.e.* without inferring from it as an assertion to the fact asserted, . . . the Hearsay rule does not oppose any barrier, because it is not applicable.' 6 Wigmore on Evidence, 234, § 1788.

"The testimony in question was not hearsay, but, on the contrary, was original evidence as to respondent's knowledge of the dangerous condition of the street, such knowledge being a fact which the jury was entitled to take into consideration in determining whether or not respondent had stopped before entering the intersection. *Olson v. Seldovia Salmon Co.*, 88 Wash. 225, 234, 152 Pac. 1033, 1036; *Nelson v. Bjelland*, 1 Wn. (2d) 268, 95 P. (2d) 784, 125 A.L.R. 641; 1 Jones on Evidence (4th ed.), 565, § 300."

After Hanowell was arrested, but before he was tried, Rose Chapin was brought up for hearing before Judge Olson, sitting as judge of the juvenile department. She there admitted that Hanowell had had sexual intercourse with her and related the details. In the instant case, for the purpose of proving the falsity of Rose Chapin's testimony in the Hanowell trial, the state called Judge Olson, who testified as to these admissions.

Appellant contends that this evidence was hearsay and therefore inadmissible.

In the case at bar, it was first necessary to establish that Rose Chapin committed perjury before the appellant could be convicted for subornation. Although, by statute, subornation of perjury has been declared to be an offense separate and distinct from perjury, still, as to the perjury, the suborner is an accessory before the fact. He lays the groundwork for the crime prior to its commission. The perjurer's guilt must be established before the suborner's guilt may be proven. In fact, a charge of subornation against the suborner and a charge of perjury against the person suborned may be joined in the same indictment; *Hammer v. United States*, 271 U. S. 620, 70 L. Ed. 1118, 46 S. Ct. 603; *State v. Porter, supra*; and in the instant case, but for the fact that the perjurer was a juvenile, it is not unreasonable to speculate that they would have been so joined.

The early case of *State v. Mann*, 39 Wash. 144, 81 Pac. 561, is apposite. There the appellant and his wife were jointly informed against for the crime of arson, the wife being accused of the commission of the crime, and the appel-

lant of aiding and abetting her. They were granted separate trials, the appellant being tried first. Subsequent to the commission of the offense, the wife, Nettie Mann, made certain confessions and admissions which tended to incriminate both of them, and these admissions were admitted in evidence at the trial of the appellant, over his objection. In upholding the admissibility of this evidence, we said:

"In order to convict the appellant it was necessary for the state to prove the crime as alleged; that is to say, it must show, first, that Nettie Mann committed the crime of arson; and second, that the appellant aided and abetted her therein. The state, in order to prove the first of the requisites, could resort to any evidence which would have been admissible had Nettie Mann herself been upon trial. This would include her confessions and admissions, as well as any other competent evidence tending to prove the crime as laid."

This rule has been adhered to in the subsequent cases of *State v. Vane,* 105 Wash. 421, 178 Pac. 456; *State v. Lyda,* 129 Wash. 298, 225 Pac. 55; and *State v. Anderson,* 165 Wash. 437, 5 P. (2d) 994; all of which hold that, in the trial of an accessory or accomplice, any evidence which would have been admissible against the principal to prove the perpetration of the crime is admissible against the accessory or accomplice. Had Rose Chapin been on trial for perjury, her admissions would have been admissible against her; we therefore hold them admissible against the appellant.

 Appellant further contends that Judge Olson's testimony concerning Rose Chapin's admissions at the juvenile hearing amounted to a violation of privilege.

Rem. Rev. Stat., § 1987-10 [P.P.C. § 359-19], provides that any child may, upon request of the child, or either of its parents, or its guardian, or its custodian, have a private hearing upon the question of its dependency or delinquency; that the probation officer's investigation record and report shall be withheld from public inspection, but that such record shall be kept open to inspection of the child, its parents, guardian, or attorney, and such other persons as may secure a special order of the court therefor, and that such records shall be destroyed, in the discretion of the

judge, at any time before the child becomes twenty-one years of age.

It does not appear in the record that Rose Chapin, or anyone else legally qualified to do so, demanded a private hearing. The probation officer was not called, nor was his investigation record or report placed in evidence.

Furthermore, the privilege, if any, was personal to the juvenile, and the appellant cannot complain of its violation, if there was such. *Lindsey v. People,* 66 Colo. 343, 181 Pac. 531, 16 A. L. R. 1250.

Appellant relies upon 8 Wigmore on Evidence (3d ed.) 531, § 2285, wherein is contained the four fundamental conditions precedent to the establishment of privilege. The fourth condition there stated is that:

"The *injury* that would inure to the relation by the disclosure of the communications must be *greater than the benefit* thereby gained for the correct disposal of litigation."

Appellant seeks also to apply to this situation Rem. Rev. Stat., § 1214 [P.P.C. § 38-9], which provides:

"The following persons shall not be examined as witnesses: . . .

"(5) A public officer shall not be examined as a witness as to communications made to him in official confidence, when the public interest would suffer by the disclosure."

*Lindsey v. People, supra,* is the leading case on the subject of the privilege of a judge of a juvenile court. There had been a murder at which the deceased's wife and twelve-year-old son alone were present, and the wife was tried for the murder. Meanwhile, the son had gone to Lindsey, the juvenile judge, and had stated in confidence that he, the son, had fired the fatal shot and gave his reasons. On the trial of the mother, the son testified in her behalf. To discredit his testimony, the juvenile judge was called to disclose the statement made to him by the son. He claimed privilege in spite of repeated orders from the bench that he testify. Upon his ultimate refusal, he was cited for criminal contempt, hence this action. Although the case is not as strong as it might have been, since the disclosures

by the son were made prior to the commencement of the statutory juvenile proceeding, it was held, with three judges dissenting, that the communication was not privileged.

Passing upon Professor Wigmore's fourth fundamental condition of privilege, the Colorado court said:

"Considering the importance of the case on trial to the defendant as well as the people, and the rare instances in which courts are likely to be confronted with a similar situation, it appears to us beyond question that the benefit to be gained by the correct disposal of the litigation was so infinitely greater than any injury which could possibly inure to the relation by the disclosure of the communication, that the requirements of the fourth section of the rule were not met, and the rule is inapplicable."

The above quotation also answers appellant's contention that Rem. Rev. Stat., § 1214(5), is controlling in this situation.

In the recent case of *State ex rel. Haugland v. Smythe,* 25 Wn. (2d) 161, 169 P. (2d) 706, Wigmore's four conditions of privilege are discussed relative to production, in a juvenile proceeding, of county welfare records.

Though we were to grant that the communication was privileged as to Rose Chapin, it would seem that she waived it when, being apprised of her constitutional right against self incrimination, she subsequently took the witness stand and voluntarily testified that Hanowell had sexual intercourse with her. Furthermore, Judge Olson was given an opportunity to decline to testify. Under the circumstances, he neither violated the statute nor any confidence in so testifying.

Appellant's last assignment of error concerns certain evidence which he contends was wrongfully excluded. In dismissing this assignment, it is sufficient to say that an examination of the record discloses that the question alleged to have been wrongfully excluded was asked and answered before.

The judgment is affirmed.

STEINERT, ROBINSON, JEFFERS, SCHWELLENBACH, and ABEL, JJ., concur.

176

MILLARD, J. (dissenting)—The witness whom appellant is, charged to have suborned, changed her story; and her subsequent testimony, it is clear, is not and could not be the basis of the charge of subornation of perjury. Concededly, she told the truth; therefore, it follows that appellant did not induce the witness to swear falsely. At most, there is only the inference that appellant endeavored—unsuccessfully, however—to persuade the witness to tell a story different from the true one she related. The judgment should be reversed with direction to dismiss the action.

SIMPSON, J., concurs with MILLARD, J.

